## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**J. MICHAEL WINKLER,**              )
c/o Cornerstone Law Firm             )
8350 N. St. Clair Ave, #225          )
Kansas City, MO 64151                )
                                     )
       Plaintiff,            )
                                     )    Case No. _____
    v.                     )
                                     )
**MARS WRIGLEY CONFECTIONERY**       )
**US, LLC,**                         )    **REQUEST FOR JURY TRIAL**
*Registered Agent:*                  )
The Corporation Company, Inc.        )
112 SW 7th Street, Suite 3C          )
Topeka, KS 66603                     )
                                     )
       Defendant.            )

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff J. Michael Winkler by and through his attorneys, and for his cause of action against Defendant Mars Wrigley Confectionary US, LLC, states and alleges as follows:

### Parties and Jurisdiction

1.     This is an employment case based upon and arising under the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADAAA"), and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").

2.     Plaintiff J. Michael Winkler (hereinafter "Plaintiff") is a citizen of the United States, domiciled in Topeka, Kansas.

3.     Defendant Mars Wrigley Confectionary US, LLC (hereinafter "Mars") is a limited liability company organized under the laws of Delaware, with one or more members domiciled outside the State of Kansas.

4.      Mars conducts substantial and continuous business in the State of Kansas.

5.      At all relevant times, Mars employed more than five hundred (500) employees.

6.      At all relevant times, Mars employed fifty (50) or more employees within a seventy-five (75) mile radius of the facility at which Plaintiff worked.

7.      At all relevant times, Mars was engaged in interstate commerce.

8.      Mars is an employer within the meaning of the ADAAA.

9.      Mars is an employer within the meaning of the FMLA.

10.     Jurisdiction is proper in the District of Kansas pursuant to 28 U.S.C. § 1331 as some or all of Plaintiff's claims arise under the laws of the United States.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

### Administrative Procedures

12.     On or about December 26, 2019, Plaintiff timely filed a charge of discrimination, alleging discrimination based on his disability and retaliation, with the United States Equal Employment Opportunity Commission ("EEOC") and the Kansas Commission on Human Rights (attached as Exhibit 1 and incorporated herein by reference).

13.     On or about July 27, 2020, the EEOC issued Plaintiff a Notice of Right to Sue with regard to his claims (attached as Exhibit 2 and incorporated herein by reference).

14.     This lawsuit was filed within 90 days of the issuance of the EEOC's Notice of Right to Sue.

15.     The aforesaid Charge of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties, and accordingly, the sweep of

the judicial complaint may be and is as broad as the scope of an EEOC investigation which could reasonably be expected to have grown out of the Charges of Discrimination.

16.     Plaintiff has satisfied all private administrative and judicial prerequisites and judicial prerequisites to the institution of this action.

17.     This Complaint is filed within the applicable statute of limitations.

### Additional Factual Allegations

18.     Plaintiff began working at Mars' Topeka, Kansas, facility in approximately November 2016 as a Shift Manager.[1]

19.     On or around May 2, 2019, Plaintiff provided a doctor's note, issued earlier that day on Plaintiff's behalf by a medical provider, to Mars' on-site health department at its Topeka, Kansas, facility, indicating that he would need to be excused from work that day because of severe pain, numbness, and tingling in his legs, and would need to remain off of work until the following Monday, May 6, 2019, at the earliest, at which date, Plaintiff would consult with another medical provider regarding his symptoms.

20.     On May 2, 2019, Plaintiff's job title was Shift Manager, and he was assigned to supervise the packaging line at the plant on the A Shift from 11:00 p.m. through 8:00 a.m.

21.     When Plaintiff provided the doctor's note to Mars' on-site health department on May 2, 2019, he also indicated that he would need to begin taking leave under the FMLA immediately at the instruction of his medical provider, and requested the paperwork for starting the process.

22.     As a Shift Manager, Plaintiff was expected to attend a managers' meeting that was scheduled for 6:00 p.m. on May 2, 2019.

---

[1] On or around October 2, 2017, Mars changed its name with the Kansas Secretary of State from Mars Chocolate North America, LLC, to Mars Wrigley Confectionary US, LLC. Plaintiff's employment with Mars began under the former name but concluded under the latter.

23.     Plaintiff asked his immediate supervisor (hereinafter "G.K."), a Value Stream Manager, if he could attend the managers' meeting via Skype because of the pain from which he was suffering and for which his medical provider had indicated that he needed to be excused from work.

24.     G.K. denied Plaintiff's request to attend the managers' meeting via Skype.

25.     Plaintiff attended the managers' meeting in person as requested by G.K.

26.     After the managers' meeting, Plaintiff notified G.K. that he had provided a note from his medical provider to Mars' on-site health department at its Topeka, Kansas, facility, indicating that he would need to be excused from work that day, and at least until the following Monday, May 6, 2019, and that he had requested the paperwork to begin the FMLA approval process for the time he was going to miss.

27.     Despite being held off of work from May 2, 2019, through May 6, 2019, Plaintiff covered a shift for a fellow Shift Manager during the A Shift beginning on May 3, 2019.

28.     Plaintiff was willing to cover this shift despite his medical provider's instructions to remain off work for several reasons, to wit, because:

      a.   Plaintiff felt obligated to cover this shift because he had committed to do so prior to receiving instructions from his medical provider to remain off work;

      b.   Plaintiff's regular team was not operational during that shift, so he could focus entirely on the shift he was covering; and

      c.   Plaintiff would not be required to be nearly as active as he would be on his normal shift.

29.     Although Plaintiff was unfamiliar with the processes of the line managed by the fellow Shift Manager for whom he was covering, he knew that Mars would have a number of skilled workers on the line on whom he could rely to make sure the line operated smoothly.

30.     Approximately thirty (30) minutes prior to the end of the shift Plaintiff covered beginning on May 3, 2019, G.K. called Plaintiff from home and asked him a question about the operation of the line Plaintiff was supervising during that shift.

31.     Because of his lack of familiarity with the processes of the line, Plaintiff could not answer the question G.K. asked.

32.     G.K. became angry with Plaintiff's inability to answer his question and told Plaintiff to wait for him to arrive at Mars' Topeka, Kansas, facility so they could have a meeting.

33.     Upon G.K.'s arrival at Mars' Topeka, Kansas, facility, he asked Plaintiff why he could not answer G.K.'s question about the operation of the line he was supervising.

34.     In response to G.K.'s question regarding why Plaintiff could not answer his question about the operation of the line he was supervising, Plaintiff reminded G.K. that he had very limited experience working on that particular line and that what experience he had was on day shifts when other managers with experience on that line were available for assistance, and suggested that one of Mars' skilled workers with experience on the line would likely be able to easily answer G.K.'s question.

35.     Upon Plaintiff's response to his question, G.K. inquired into the whereabouts of the Shift Manager for whom Plaintiff was covering.

36.     Upon Plaintiff's response to his question about Plaintiff's inability to answer his question about the operation of the line he was supervising, G.K. further told Plaintiff that he

was suspending Plaintiff's employment, stating, "Since you don't know your business, I can't trust you."

37.    At that time, G.K. also asked whether Plaintiff would prefer to be demoted or fired because his inability to answer G.K.'s question about the operation of the line he was supervising, and stated that he was going to reach out to Mars' human resources department to determine the next steps.

38.    A few hours later, G.K. contacted Plaintiff by phone, notifying him that he was placing Plaintiff on suspension until at least Monday, at which point he would discuss potential next steps with Mars' human resources department.

39.    In response to this suspension of his employment, Plaintiff reminded G.K. of their discussion approximately one day earlier regarding Plaintiff's immediate need for FMLA leave.

40.    At the end of the phone conversation with G.K. in which G.K. suspended Plaintiff's employment, Plaintiff contacted the nurse case manager for Mars' Topeka, Kansas, facility (hereinafter "J.P.") and relayed the events of the prior shift and the substance of his phone conversation with G.K.

41.    J.P. assured Plaintiff that his employment would not be terminated because of the events of the prior shift and instructed Plaintiff to contact Mars' human resources department on Monday to discuss the status of his request for FMLA leave.

42.    On May 6, 2019, Plaintiff consulted with another medical professional as anticipated.

43.    That medical professional instructed Plaintiff to remain off work until at least May 30, 2019, at which time, Plaintiff was scheduled to consult with another medical professional.

44.    Upon receiving the instruction from his medical provider to remain off work until May 30, 2019, Plaintiff promptly conveyed that instruction to a representative from Mars'

human resources department, as well as to J.P., who indicated that when she updated Plaintiff's FMLA paperwork, G.K. would also be notified.

45.     At the consultation with the medical provider on May 30, 2019, Plaintiff's medical provider scheduled Plaintiff for an MRI and further held Plaintiff off work until June 18, 2019.

46.     Plaintiff sent the information regarding his schedule MRI and the further extension of his time off work to J.P. immediately after his appointment with his medical provider on May 30, 2019, and also updated G.K.

47.     On May 14, 2019, Plaintiff followed up with his medical provider regarding the results of his MRI.

48.     Plaintiff's MRI revealed that he suffered from severe degenerative disc disease throughout his cervical and lumbar spine, which had been causing the pain, numbness, and tingling in his legs.

49.     Plaintiff's medical provider told Plaintiff that he could return to work beginning June 24, 2019, but that Plaintiff should anticipate missing more work that week for additional treatment.

50.     On June 24, 2019, prior to Plaintiff's anticipated return to work, G.K. contacted Plaintiff, scheduling a phone conference for the following day, and instructing him not to come to work for the intervening scheduled shift.

51.     Plaintiff attended G.K.'s requested phone conference on June 25, 2019; another human resources representative for Mars was also in attendance.

52.     During the June 25, 2019, phone conference, G.K. restated his intention to demote Plaintiff, and stated that he planned to extend Plaintiff's suspension because Mars had allegedly

discovered additional issues regarding Plaintiff's performance while he had been out on FMLA leave.

53.     In response to G.K.'s statement that he planned to extend the suspension of Plaintiff's employment, Plaintiff reminded G.K. that the reason for his absence since May 3, 2019, was that he had been out on FMLA leave.

54.     During that meeting, after Plaintiff reminded G.K. that the reason for his absence since May 3, 2019, was that he had been out on FMLA leave, the human resources representative who attended the meeting, and who was relatively new to Mars' Topeka, Kansas, facility, sent a text message to Plaintiff to ask if she could contact Plaintiff by telephone later that day.

55.     The human resources representative asked G.K. whether he was aware that Plaintiff had been out on FMLA, and when G.K. responded that he wasn't aware of all of the details, the human resources representative called an end to the meeting so she could investigate further.

56.     When the human resources representative contacted Plaintiff by telephone later that day, Plaintiff told her that he was disputing the deficiencies raised by G.K. in the meeting.

57.     On June 26, 2019, Plaintiff underwent another MRI, and was instructed by his medical provider to remain off work until July 17, 2019.

58.     On July 17, 2019, the day Plaintiff was scheduled to return to work, G.K. contacted Plaintiff by telephone and told Plaintiff not to come to work but did not indicate when Plaintiff was expected back.

59.     Plaintiff provided notice to J.P. that his medical provider instructed him to remain off work until July 17.

60.     On the following day, G.K. contacted Plaintiff by telephone and told him to come to work that night for his shift.

61.    On this call, G.K. also told Plaintiff that the next day, they would go over the results of a sixty- (60-) day performance improvement plan that had been implemented on March 15, 2019, but through which Plaintiff had only worked through approximately 49 days before beginning his FMLA leave on May 2, 2019.

62.    G.K. did not review the results of Plaintiff's sixty- (60-) day performance improvement plan on or around July 19, 2019, as anticipated.

63.    Despite not reviewing Plaintiff's sixty- (60-) day performance improvement plan on or around July 19, 2019, as anticipated, Plaintiff continued to work between July 18, and July 26, 2019.

64.    On July 26, 2019, G.K. performed Plaintiff's sixty- (60-) day performance improvement plan review and also issued Plaintiff a Final Written Warning.

65.    The Final Written Warning G.K. issued Plaintiff contained several allegations that were factually inaccurate.

66.    Plaintiff offered to provide G.K. with documentation that would prove the inaccuracy of the allegations in his Final Written Warning.

67.    G.K. declined to review the documentation offered by Plaintiff.

68.    After the meeting with G.K., Plaintiff contacted the plant manager for Mars' Topeka, Kansas, facility (hereinafter "B.S.").

69.    Plaintiff told B.S. that he was disputing the allegations contained in both his sixty- (60-) day performance improvement plan review and his Final Written Warning, and asked B.S. whether he wanted to discuss Plaintiff's concerns, or whether Plaintiff should just raise his concerns with Mars' human resources department.

70.     B.S. told Plaintiff that he believed if Mars' human resources department wanted B.S.'s input, someone would let B.S. know.

71.     On July 29, 2019, Plaintiff contacted the head of Mars' human resources department (hereinafter "C.K.") and told him that he believed that he was being treated unfairly, and that he felt that it started when Plaintiff told G.K. that he wanted to take FMLA leave, and that it "snowballed" from there.

72.     After Plaintiff's good faith report of retaliation to C.K., Plaintiff continued to work his regular shift in his regular role until August 15, 2019.

73.     On August 15, 2019, G.K. and a representative from Mars' human resources department told Plaintiff that they had allegedly verified all of the allegations in Plaintiff's sixty-(60-) day performance improvement plan review and his Final Written Warning.

74.     G.K. and the human resources representative also informed Plaintiff that he had been accused of another violation of Mars' rules.

75.     Plaintiff was told that his employment was again being suspended pending an investigation.

76.     Plaintiff was also instructed to clean out his locker and turn in his identification badge.

77.     Mars terminated Plaintiff's employment on August 18, 2019.

## COUNT I
### Violation under 42 U.S.C. §§ 12101 *et seq.*
### Disability Discrimination – Termination

78.     Plaintiff re-alleges and incorporates herein by reference, as though fully set forth herein, all of the above numbered paragraphs.

79.     At all times relevant, Plaintiff was a member of a protected class pursuant to the ADAAA because he had one or more physical impairments that substantially limited one or more of his major life activities, had a record of such impairment(s), and/or was regarded by Mars as having such physical impairment(s), to wit, degenerative disc disease.

80.     At all times relevant, Plaintiff's disabilities substantially limited one or more of his daily life activities including but not limited to the ability to stand, squat, lift, and reach.

81.     At all times relevant, Plaintiff could perform the essential functions of his job with or without reasonable accommodation.

82.     In terminating Plaintiff's employment, Mars subjected Plaintiff to an adverse employment action.

83.     Plaintiff's disability was at least a motivating factor in Mars' decision to terminate his employment.

84.     At all times mentioned herein, before and after, the above described perpetrators were agents, servants, and employees of Mars, and were at all such times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized or ratified by Mars, thus making Mars liable for said actions under the doctrine of *respondeat superior*.

85.     Mars failed to make good faith efforts to establish and enforce policies to prevent illegal discrimination against its employees.

86.     Mars failed to properly train or otherwise inform its supervisors and employees concerning their duties and obligations under the civil rights laws, including the ADAAA.

87.     As shown by the foregoing, as a result of his termination, Plaintiff suffered intentional discrimination at the hands of the Mars in violation of the ADAAA.

88.     As a direct and proximate result of Mars' actions and/or omissions, Plaintiff has been deprived of income as well as other monetary and non-monetary benefits.

89.     As a further direct and proximate result of Mars' actions and/or omissions, Plaintiff has suffered humiliation, mental anguish, pain, and a loss of self-esteem in the form of garden variety emotional distress and related compensatory damages.

90.     Mars' conduct was willful, wanton, malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Mars or to deter Mars and other entities from like conduct in the future.

91.     Pursuant to the provisions of the ADAAA, Plaintiff is entitled to recover reasonable attorneys' fees from Mars.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Mars for economic damages, including but not limited to back-pay and lost benefits; for compensatory damages, including but not limited to garden variety emotional distress; for equitable relief, including but not limited to front-pay and injunctive relief; for punitive damages; for reasonable attorney's fees and costs incurred herein; for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT II
### Violation under 42 U.S.C. §§ 12101 *et seq.*
### Retaliation

92.     Plaintiff re-alleges and incorporates herein by reference, as though fully set forth herein, all of the above numbered paragraphs.

93.    At all times relevant, Plaintiff was a member of a protected class pursuant to the ADAAA because he had one or more physical impairments that substantially limited one or more of his major life activities, had a record of such impairment(s), and/or was regarded by Mars as having such physical impairment(s), to wit, degenerative disc disease.

94.    At all times relevant, Plaintiff's disabilities substantially limited one or more of his daily life activities including but not limited to the ability to stand, squat, lift, and reach.

95.    At all times relevant, Plaintiff could perform the essential functions of his job with or without reasonable accommodation.

96.    Plaintiff engaged in a protected activity under the ADAAA by requesting the reasonable accommodation of limited time off of work as instructed by his medical provider.

97.    Plaintiff's request for reasonable accommodation was at least a determining factor in Mars' decision to terminate his employment.

98.    At all times mentioned herein, before and after, the above described perpetrators were agents, servants, and employees of Mars, and were at all such times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized or ratified by Mars, thus making Mars liable for said actions under the doctrine of *respondeat superior*.

99.    Mars failed to make good faith efforts to establish and enforce policies to prevent illegal discrimination against its employees.

100.   Mars failed to properly train or otherwise inform its supervisors and employees concerning their duties and obligations under the civil rights laws, including the ADAAA.

101.   As shown by the foregoing, as a result of his termination, Plaintiff suffered intentional discrimination at the hands of the Mars in violation of the ADAAA.

102.    As a direct and proximate result of Mars' actions and/or omissions, Plaintiff has been deprived of income as well as other monetary and non-monetary benefits.

103.    As a further direct and proximate result of Mars' actions and/or omissions, Plaintiff has suffered humiliation, mental anguish, pain, and a loss of self-esteem in the form of garden variety emotional distress and related compensatory damages.

104.    Mars' conduct was willful, wanton, malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Mars or to deter Mars and other entities from like conduct in the future.

105.    Pursuant to the provisions of the ADAAA, Plaintiff is entitled to recover reasonable attorneys' fees from Mars.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Mars for economic damages, including but not limited to back-pay and lost benefits; for compensatory damages, including but not limited to garden variety emotional distress; for equitable relief, including but not limited to front-pay and injunctive relief; for punitive damages; for reasonable attorney's fees and costs incurred herein; for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as the Court deems just and proper.

**COUNT III**
**Violation under 29 U.S.C. § 2615(a)(2)**
**Retaliation**

106.    Plaintiff re-alleges and incorporates herein by reference, as though fully set forth herein, all the above numbered paragraphs.

107.    At all relevant times, Plaintiff had a health condition, to wit degenerative disc disease.

108.    At all relevant times, Plaintiff was an eligible employee pursuant to the FMLA.

109.    In 2019, Plaintiff engaged in a protected activity each time he requested FMLA leave or otherwise inquired about his FMLA rights with relation to his doctor's instructions to stay off work.

110.    Plaintiff engaged in a protected activity when he took FMLA leave.

111.    Plaintiff suffered an adverse employment action when Mars terminated his employment in August 2019.

112.    A causal connection exists between Plaintiff's exercise of his FMLA rights and the aforementioned adverse employment action taken against him.

113.    At all times mentioned herein, before and after, the above described perpetrators were agents, servants, and employees of Mars, and were at all such times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized or ratified by Mars, thus making Mars liable for said actions under the doctrine of *respondeat superior*.

114.    Mars failed to make good faith efforts to establish and enforce policies to address and prevent illegal discrimination against its employees.

115.    Mars failed to properly train or otherwise inform its supervisors and employees concerning their duties and obligations under the civil rights laws, including the FMLA.

116.    As shown by the foregoing, Mars engaged in a willful violation of the FMLA, and its actions were not in good faith.

117.    As a direct and proximate result of Mars' actions and/or omissions, Plaintiff has been deprived of income as well as other monetary and non-monetary benefits.

118.    Pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), Plaintiff is entitled to recover liquidated damages from Mars.

119.    Pursuant to 29 U.S.C. § 2617(a)(3), Plaintiff is entitled to recover reasonable attorneys' fees from Mars.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Mars for economic damages, including but not limited to back-pay and lost benefits; for equitable relief, including but not limited to front-pay and injunctive relief; for liquidated damages; for reasonable attorneys' fees and costs incurred herein; for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

CORNERSTONE LAW FIRM

By:  /s/ Joshua P. Wunderlich
    Joshua P. Wunderlich D. Kan. #78506
    j.wunderlich@cornerstonefirm.com
    M. Katherine Paulus   KS BAR #23866
    m.paulus@cornerstonefirm.com
    5821 NW 72nd St.
    Kansas City, Missouri 64151
    Telephone          (816) 581-4040
    Facsimile          (816) 741-8889

    ATTORNEYS FOR PLAINTIFF